IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHRISTOPHER DAVIS, | ) |
| Plaintiff, | ) ) |
| | ) No. 16-cv-10764 |
| v. | ) |
| | ) Judge Andrea R. Wood |
| RAME I. ABDELJABER, et al., | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Christopher Davis was a pretrial detainee at the Lake County Jail when he had an encounter with a correctional officer that resulted in Davis being tased twice. Consequently, he has brought the present action under 42 U.S.C. § 1983 against two Lake County Jail correctional officers, Defendants Rame Abdeljaber and David Corbin. Defendants have now moved for summary judgment. (Dkt. No. 51.) For the reasons that follow, Defendants' motion is denied.

### BACKGROUND

Unless otherwise noted, the following facts are undisputed.

At all times relevant to this action, Davis was a pretrial detainee at the Lake County Jail ("Jail") being held on charges of attempted murder. (Defs.' Statement of Material Facts ("DSMF") ¶¶ 1, Dkt. No. 56; Pl.'s Resp. to Defs.' Statement of Facts ("PRDSF") ¶¶ 1, 10, Dkt. No. 63; Defs.' Reply to Pl.'s Additional Statements of Fact ("DRPSAF"), Dkt. No. 68.) Davis was a long-time inmate at the Jail with a history of disciplinary violations, including violations for making false statements, damage to property, intimidation, insubordination, making threats to correctional officers, and interfering with staff duties. (DSMF ¶¶ 3–4; PRDSF ¶¶ 3–4.) In addition, Davis's criminal record included a conviction for aggravated battery to a peace officer.

(DSMF ¶ 2; PRDSF ¶ 2.) By his own admission, Davis behaved in ways that could be interpreted as disruptive to Jail staff, but he claimed he only did what was necessary for him to get attention or assistance. (DSMF ¶ 6; PRDSF ¶ 6.) Davis also acknowledges making threats that he intended to cause correctional officers to "back off" and "think twice before they attack" him. (*Id.*)

Inmates who are considered aggressive and disruptive, and present a heightened threat to safety and security at the Jail, are housed in the Administrative Segregation Unit ("ASU"). (DSMF ¶¶ 7–8; PRDSF ¶¶ 7–8.) At the time of the events giving rise to this action, Davis was confined in the ASU. (DSMF ¶ 7; PRDSF ¶ 7.) While Davis claims that he requested to be placed in the ASU because he feared that other inmates and correctional officers presented a risk to his safety, Defendants contend he was there due to his criminal history and propensity for rule-breaking. (*Id.*)

On March 24, 2016, an incident involving Davis's noncompliance with orders from Defendants Corbin and Abdeljaber resulted in Abdeljaber using a taser to subdue Davis. (DSMF ¶ 10; PRDSF ¶ 10.) Prior to that date, both Corbin and Abdeljaber were familiar with Davis's disciplinary history. (DSMF ¶ 9; PRDSF ¶ 9.) The March 24 incident was captured on video by correctional officers' body cameras. It began when Davis refused to comply with Corbin's order to move his legal documents from the ASU's dayroom to his cell. (DSMF ¶¶ 11–12; PRDSF ¶¶ 11–12.) In response to Davis's failure to comply, Corbin pointed his taser at Davis. (DSMF ¶ 15; PRDSF ¶¶ 11, 15.) This caused Davis to threaten to "knock out" Corbin. (DSMF ¶ 13; PRDSF ¶ 13.) Davis also covered his face and put tissue in his nostrils to protect himself against the possible use of pepper spray. (*Id.*) Ultimately, Corbin declined to use his taser and Davis returned to his cell. (DSMF ¶¶ 15–16; PRDSF ¶¶ 15–16.)

When Davis was back in his cell, he intentionally broke a sprinkler, causing flooding that spread from his cell to the ASU. (DSMF ¶ 17; PRDSF ¶ 17.) Later, Davis explained that he broke the sprinkler because he "didn't even think jail rules applied at that moment." (DSMF ¶ 18; PRDSF ¶ 18.) Specifically, he claimed that he was reacting to the threat to his safety posed by Corbin's brandishing of the taser, and therefore Jail rules did not take precedence over safety. (*Id.*) As his cell flooded, Jail personnel, including Abdeljaber and Corbin, came to remove Davis from his cell. (DSMF ¶ 20; PRDSF ¶ 20.) Davis threatened physical harm to the personnel arriving at his cell and screamed profanities. (DSMF ¶ 21; PRDSF ¶ 21.) Eventually, Davis was led to a room where he could change out of his wet clothing. (DSMF ¶ 22; PRDSF ¶¶ 21–22.) However, Davis refused to change in front of Jail personnel, leading Abdeljaber to tase him. (DSMF ¶ 22; PRDSF ¶ 22.) Davis claims that once Abdeljaber pulled out his taser, Davis turned to the wall and indicated his willingness to comply, at which point Abdeljaber deployed the taser. (PRDSF ¶ 22.)

After being tased, Davis fell to the ground. (DRPSAF ¶ 10.) While Davis declined medical treatment, he nonetheless was brought to the medical unit. (DSMF ¶ 23; PRDSF ¶ 23; DRPSAF ¶ 11.) On the way, Davis was led into an elevator and faced the rear, as required under Jail policy. (DSMF ¶ 24; PRDSF ¶ 24.) Once in the elevator, Davis tried to turn away from the rear to confront Abdeljaber. (DSMF ¶ 25; PRDSF ¶ 25.) According to Davis, he was not deliberately trying to violate Jail policy. (PRDSF ¶ 25.) Rather, he asserts that because the officers were pinning him against the wall, if he looked straight ahead his nose would also be pinned to the wall. (*Id.*) Thus, he turned his head to the left and right in an effort to avoid that uncomfortable position. (*Id.*) Davis was tased again after disobeying multiple orders to turn his face to the rear of the elevator. (DSMF ¶ 26; PRDSF ¶ 26; DRPSAF ¶ 14.)

3

**DISCUSSION**

Summary judgment is appropriate if the admissible evidence considered as a whole shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law, even after all reasonable inferences are drawn in the non-movant's favor. *Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 517 (7th Cir. 2011). Davis's Amended Complaint sets forth two claims under 42 U.S.C. § 1983 for violations of the Fourteenth Amendment's Due Process Clause. First, Davis alleges that Abdeljaber used unconstitutionally excessive force when he tased Davis twice. And second, Davis asserts a failure to intervene claim against Corbin for not protecting Davis from the two tases.[1] Defendants seek summary judgment on both claims, arguing that the force used against Davis was reasonable under the circumstances. Alternatively, Defendants contend that to the extent that either Abdeljaber or Corbin violated Davis's constitutional rights, they nonetheless should be awarded summary judgment because they are entitled to qualified immunity.

The Fourteenth Amendment's Due Process Clause governs excessive force claims brought by pretrial detainees. *Forrest v. Prine*, 620 F.3d 739, 743 (7th Cir. 2010). To prevail on an excessive force claim, a pretrial detainee must show "that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley v. Hendrickson*, 576 U.S. 389, 396–97 (2015). That is a fact-specific inquiry in which a court must account for "the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id.* at 397. In addition, a court must "account for the legitimate interests that stem from the government's need to manage the facility in which the individual is detained,

---

[1] While Davis's Amended Complaint names Corbin as a Defendant for the excessive force claim, in his opposition to Defendants' motion for summary judgment, he makes clear that "Corbin played no direct role in either taser incident" and instead seeks to hold him liable solely for his failure to intervene. (Opp'n at 6, Dkt. No. 64.)

appropriately deferring to policies and practices that in the judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security." *Id.* (internal quotation marks omitted). Among the considerations that bear on the reasonableness or unreasonableness of the use of force are:

> The relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Id.* Where there are no genuine disputes of material fact, "objective reasonableness 'is a legal determination rather than a pure question of fact for the jury to decide.'" *Calhoun v. Wray*, No. 18 C 7551, 2020 WL 4586108, at *3 (N.D. Ill. Aug. 10, 2020) (quoting *Dockery v. Blackburn*, 911 F.3d 458, 464 (7th Cir. 2018)).

According to Davis, each of Abdeljaber's two uses of the taser was an objectively unreasonable use of force. The Seventh Circuit has previously addressed when the use of a taser on an inmate violates the Fourteenth Amendment's Due Process Clause, although those cases borrowed the Eighth Amendment's standard for excessive force claims brought by convicted prisoners, which requires a subjective inquiry into an officer's state of mind. *Forrest*, 620 F.3d 739; *Lewis v. Downey*, 581 F.3d 467 (7th Cir. 2009). Since then, the Supreme Court has made clear that the Fourteenth Amendment inquiry is an objective inquiry—the plaintiff must show that the force used against him was objectively unreasonable. *Kingsley*, 576 U.S. at 396–97. Nonetheless, those pre-*Kingsley* decisions are instructive since anything that would violate the more stringent Eighth Amendment standard would necessarily also violate the Fourteenth Amendment. *See e.g.*, *Gaston v. Beatty*, No. 17-cv-01798, 2020 WL 1288878, at *4 n.8 (N.D. Ill. Mar. 18, 2020); *Williams v. Harmston*, No. 15 C 5045, 2018 WL 2435540, at *3 (N.D. Ill. May

30, 2018). Those decisions provide two guideposts in evaluating the use of a taser on an inmate: (1) "an officer's use of a Taser against an actively resisting subject either does not violate a clearly established right or is constitutionally reasonable" and (2) "an officer may not use significant force (like a Taser) against a nonresisting or passively resisting subject." *Dockery*, 911 F.3d at 467 (internal quotation marks omitted).

Davis claims that there is a genuine dispute of material fact as to whether Davis was actively resisting Abdeljaber's orders prior to each use of the taser. Often, when a correctional officer is "faced with aggression, disruption, or physical threat . . . compelling compliance with an order is a valid penological justification for use of a taser." *Lewis*, 581 F.3d at 477. It is undisputed that prior to the first tase, Davis had engaged in a series of aggressive, threatening, and severely disruptive behaviors. In particular, Davis disobeyed an order from Corbin to move his legal documents into his cell and instead responded with a threat of physical harm against him. *See id.* at 476 ("When an inmate refuses to obey a proper order, he is attempting to assert his authority over a portion of the institution and its officials. Such refusal and denial of authority places the staff and other inmates in danger." (internal quotation marks omitted)). Both Corbin and Abdeljaber believed that Davis presented a danger to their safety, as they were aware of his long history of disruptive behavior at the Jail, including his numerous threats against correctional officers and his previous conviction for aggravated battery to a peace officer. Indeed, Davis himself confirmed that he was a disruptive and uncooperative inmate who acted out to get attention and made threats against correctional officers who he thought needed to "back off."

After disobeying Corbin's order, Davis caused a substantial disruption to the ASU by breaking the sprinkler in his cell and flooding the entire ASU. As Abdeljaber and Corbin came to remove Davis from his cell, Davis began shouting threats and obscenities. One video in the record

shows Davis in the moments after being removed from his cell taunting correctional officers about having to clean up the flooding that he caused. Then, when Abdeljaber ordered Davis to change out of his wet clothes, Davis refused to undress in view of the correctional officers' body cameras, leading to Abdeljaber's first deployment of the taser.

According to Davis, the evidence creates a dispute of material fact as to whether that first tase was objectively reasonable. He claims that as soon as Abdeljaber pulled out his taser, Davis indicated his intent to comply with the order to undress by saying "okay, okay, okay," and turning towards the wall to further comply. Nonetheless, Abdeljaber deployed the taser before giving Davis an opportunity to demonstrate his compliance. Notably, the video evidence confirms Davis's story as to the first tase. The question is whether Abdeljaber acted unreasonably in not giving Davis a chance to comply before deploying his taser. Justification to use a taser "does not necessarily exist every time an inmate is slow to comply with an order." *Lewis*, 581 F.3d at 477. Here, a jury could reasonably conclude from the video evidence that Davis was simply slow to comply with Abdeljaber's order to undress. A reasonable jury could conclude that Davis was not flat out refusing to undress but was simply asking that he be permitted to do so off camera. But even accepting that Davis did initially defy Abdeljaber's order, a reasonable jury could easily conclude that there was no need for any use of force once Davis clearly indicated his intent to comply and began taking steps to do so. For that reason, the Court cannot find as a matter of law that Abdeljaber's first tase was not an excessive use of force.

Following the first tase, the video evidence shows correctional officers taking Davis to an elevator on the way to the medical unit. Notably, Davis displays no physical resistance, although he continues to talk back to the correctional officers, repeatedly daring Abdeljaber to tase him again. When one of the officers asks Davis to abide by the Jail's policy requiring inmates to face

7

the rear of the elevator, Davis responds that he is facing the wall even though the video evidence shows that he is turning his head from side-to-side rather than keeping his head still.

Defendants contend that the second tase was unquestionably justified due to Davis's continued taunting and belligerence and his refusal to face the rear of the elevator in accordance with jail policy. In light of the considerations bearing on the reasonableness of the use of force set forth in *Kingsley*, the Court cannot agree. First, as to Davis's taunting and belligerence, a reasonable jury may well conclude that Abdeljaber should have understood that Davis was reacting to the first tase rather than resisting. Further, it might also believe that Abdeljaber should have understood that the aftereffects of the first tase mitigated the security risk posed by Davis. And while a jury may agree that Davis was violating jail policy by not turning his head to face the rear of the elevator, it may reasonably believe Davis's assertion that he was simply trying to avoid having his face uncomfortably pressed into the wall (DRPSAF ¶ 13), and conclude that this noncompliance posed a minimal security threat. *See Cyrus v. Town of Mukwongo*, 624 F.3d 856, 863 (7th Cir. 2010) ("Force is reasonable only when exercised in proportion to the threat posed."). Given the different interpretations that a jury could give to the facts here, the Court cannot conclude as a matter of law that Abdeljaber acted reasonably in tasing Davis. *See id.* ("[S]ummary judgment is often inappropriate in excessive-force cases because the evidence surrounding the officer's use of force is often susceptible of different interpretations.")

Having found questions of fact concerning the reasonableness of Abdeljaber's use of the taser, the Court must determine whether he is nonetheless protected by qualified immunity. Qualified immunity protects public officials from being monetarily liable unless the evidence shows "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731,

8

735 (2011). For Davis to show that Abdeljaber's two tases violated his clearly established constitutional right, he "bears the burden of defeating it either by identifying a closely analogous case or by persuading the court that the conduct is so egregious and unreasonable that, notwithstanding the lack of an analogous decision, no reasonable officer could have thought he was acting lawfully." *Abbott v. Sangamon County*, 705 F.3d 706, 723–24 (7th Cir. 2013).

Here, Davis does not cite a closely analogous case but instead argues that Abdeljaber's conduct was too egregious and unreasonable for any reasonable officer to believe he was acting lawfully. At the time of the events here, the law was clear that law enforcement could "not use significant force on nonresisting or passively resisting suspects." *Id.* at 732. And while force may sometimes be appropriate to compel compliance with orders, "such force could not be exaggerated or excessive and should generally follow adequate warnings." *Lewis v. Downey*, 581 F.3d 467, 479 (7th Cir. 2009). Under the facts here, a jury could reasonably conclude that Abdeljaber's conduct in tasing Davis without warning after he began complying with Abdeljaber's order to undress was such egregious conduct that no correctional officer could have believed it to be lawful. If a jury were to reach that conclusion as to the first tase, it could also reasonably find that Abdeljaber compounded the harm from the first tase by again tasing Davis simply for a slight violation of jail policy. *See Cyrus*, 624 F.3d at 863 ("Force also becomes increasingly severe the more often it is used . . . ."). Thus, the Court finds there to be a jury question as to Abdeljaber's entitlement to qualified immunity and Defendants' motion for summary judgment is denied as to him.

Because the Court cannot conclude as a matter of law that Abdeljaber acted reasonably, it proceeds to address whether Corbin is nonetheless entitled to summary judgment on Davis's failure to intervene claim against him. Even where a correctional officer is "a bystander" to an

incident of excessive use of force, he may be held liable for failure to intervene if he "(1) had reason to know that a fellow officer was using excessive force or committing a constitutional violation, and (2) had a realistic opportunity to intervene to prevent the act from occurring." *Lewis*, 581 F.3d at 472.

      Defendants largely defend against the failure to intervene claim against Corbin by insisting that neither of the underlying uses of force was unreasonable. They make no attempt to claim that Corbin was unable to intervene to stop the first tase. As to the second tase, they claim that Corbin's hands were preoccupied with restraining Davis. Implicit in this argument is that Corbin must have had some opportunity to intervene physically to stop the tase. However, Defendants provide no support for the proposition that the requisite intervention must be physical. *See Powell v. City of Berwyn*, 68 F. Supp. 3d 929, 941 (N.D. Ill. 2014) ("[A] 'realistic opportunity' to intervene may exist when an officer could have called for help, or when an officer could have cautioned the officer using excessive force to stop."). Moreover, "[w]hether an officer had sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue for the trier of fact unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005). Given the jury questions concerning whether Abdeljaber used excessive force, the Court believes whether Corbin failed to intervene to prevent that use of force must also be decided by the jury. For that reason, the motion for summary judgment is also denied as to Corbin.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (Dkt. No. 51) is denied.

ENTERED:

Dated: March 29, 2021

_____
Andrea R. Wood
United States District Judge